## S10A0092. KENDRICK v. THE STATE.
### (699 SE2d 302)

HINES, Justice.

Kenneth Earl Kendrick appeals his convictions for malice murder and possession of a firearm by a convicted felon during the commission of a felony, in connection with the death of J'Muar Undrelle Taylor. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Kendrick lived with Sheila Hill. Kendrick owned a white Oldsmobile Cutlass; Hill owned an Acura Legend. In the early morning hours of August 4, 2003, Taylor was driving a Hyundai automobile, with his friend Robert Brooks as his passenger. The men saw a white Oldsmobile Cutlass, and Taylor said that he would steal it; a light-colored Acura Legend was nearby. Taylor exited the Hyundai, and Brooks got into the driver's seat. Taylor entered the Cutlass, broke open the ignition, and drove away; Brooks followed him in the Hyundai. At a traffic light, Brooks saw a light-colored Acura Legend pull up beside the Cutlass, and three or four gunshots were fired from the Acura toward the Cutlass. The Cutlass drove through the

---

[1] Taylor was killed on August 4, 2003. On September 29, 2005, a Gwinnett County grand jury indicted Kendrick for malice murder, felony murder while in the commission of aggravated assault, felony murder while in the commission of the crime of possession of a firearm by a convicted felon, and possession of a firearm by a convicted felon during the commission of a felony. Kendrick was tried November 13-17, 2006, and was found guilty on all counts. On November 21, 2006, Kendrick was sentenced to life in prison for malice murder, and a consecutive term of 15 years in prison for possession of a firearm by a convicted felon during the commission of a felony; the convictions for felony murder stood vacated by operation of law. See *Malcolm v. State,* 263 Ga. 369, 371-374 (4), (5) (434 SE2d 479) (1993). Kendrick moved for a new trial on December 7, 2006, and amended the motion on November 10, 2008. The motion was denied on December 15, 2008, and Kendrick filed a notice of appeal on December 23, 2008. His appeal was docketed in the January 2010 term of this Court, and submitted for decision on the briefs.

light, with the Acura following; two or three more shots were fired from the Acura toward the Cutlass. After a few hours, Brooks placed an anonymous telephone call to police and related the events; he later gave police investigators a statement.

A witness who saw the cars as the gunshots were fired telephoned 911. At 3:00 a.m., a responding police officer found the Cutlass crashed against a utility pole, with Taylor in the driver's seat; he was dead from two gunshot wounds to the head. The car had struck the pole at a high rate of speed, without braking. A spent bullet was found on the floor of the Cutlass. Later that morning, Kendrick reported his Cutlass automobile stolen. A police investigator interviewed him at his home; Kendrick stated that he had seen his car at 10:00 p.m. on August 3, 2003, noticed it missing at 5:05 a.m. on August 4, 2003, and did not know who had taken it. A search warrant for Kendrick's home was secured, and executed the next day; during the execution of the warrant, Kendrick repeated the version of events he had given the day before. An officer searching Kendrick's home discovered an unfired .380 caliber cartridge; spent bullets of that caliber were found inside the Cutlass. Bullet casings found underneath the driver's seat of the Acura and in the vicinity of the Cutlass were consistent with the spent bullets found inside the Cutlass.

Kendrick was arrested, and telephoned Hill from the jail. Kendrick told Hill that: he heard his Cutlass being stolen; he chased after the Cutlass in her Acura; he shot at the driver of the Cutlass; he saw the Cutlass crash; he exited the Acura; he went to the Cutlass to see if he could identify the driver; he shot the driver; and he threw away the firearm.

At trial, Kendrick testified that: he heard his Cutlass being stolen; he took a pistol and entered Hill's Acura to give chase; he saw the driver of the Cutlass produce a pistol; he and the driver of the Cutlass shot at one another; and he drove away. No bullet holes were found on the Acura that Kendrick was driving, and no weapon was found in the Cutlass; Brooks testified that no gunshots were fired from the Cutlass, and that he never knew Taylor to carry a firearm.

1. The evidence was sufficient to enable a rational trier of fact to find Kendrick guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. On cross-examination, the State asked Kendrick whether his testimony on direct examination was "the very first time any member of law enforcement of anyone [sic] associated with the State of Georgia has heard your explanation that you were defending yourself . . .?" Kendrick's attorney objected that this was a comment on Kendrick's right to remain silent, and the trial court overruled

the objection. As Kendrick had chosen to speak to the investigating officer, the State could properly impeach him with his prior inconsistent statements. *Pye v. State*, 269 Ga. 779, 786-787 (14) (505 SE2d 4) (1998); *McMichen v. State*, 265 Ga. 598, 606 (11) (a) (458 SE2d 833) (1995). See also *Stringer v. State*, 285 Ga. 842, 846 (4) (684 SE2d 590) (2009).

3. Kendrick contends that the trial court erred in not instructing the jury on the law of defense of habitation, in the context of an automobile. See OCGA § 16-3-24.1.[2] First, it must be noted that Kendrick did not supply the court with a written request to charge specific language on the legal concept of defense of habitation. Rather, his only written submission stated that he wished the court to give the "following pattern requests to charge numbered 1 through 23," and then "22. Justification: Use of Force in Defense of Motor Vehicle." Such a request fails to comply with the requirements of USCR 10.3. While such failure would authorize the trial court to reject Kendricks's desired jury instructions, the trial court allowed Kendrick to read from the Suggested Pattern Jury Instructions the language that he wished the court to charge, and we will review the enumerated error. See *Davis v. State*, 285 Ga. 176, 178 (674 SE2d 879) (2009). Nonetheless, we take this opportunity to urge compliance with USCR 10.3 in order to ensure proper review on appeal.

As it appears in the Pattern Jury Instructions, the relevant charge reads:

> A person is justified in threatening or using force against another person when, and to the extent that, the person reasonably believes that such threat or force is necessary to prevent or terminate the other's unlawful entry into or attack upon a motor vehicle. A person is justified in use of force that is intended or likely to cause death or great bodily harm only if the entry is
>> a) made or attempted in a violent manner and the person reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person living or present in the motor vehicle and that such force is necessary to prevent the assault or offer of personal violence or

---

[2] OCGA § 16-3-24.1 reads:
   As used in Code Sections 16-3-23 and 16-3-24, the term "habitation" means any dwelling, motor vehicle, or place of business, and "personal property" means personal property other than a motor vehicle.

b) the person reasonably believes that the entry is made or attempted for the purpose of committing a felony in the motor vehicle, and that such force is necessary to prevent the commission of the felony.

Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.03.10 (4th ed. 2007). Kendrick stated that he wished the entire instruction to be given to the jury.[3]

As the trial court noted, subsection (a) of the pattern instruction, which authorizes the use of deadly force, applies when there is a person present in the automobile to be protected from "assault or offer of personal violence," see *Benham v. State*, 277 Ga. 516 (591 SE2d 824) (2004); Suggested Pattern Jury Instructions, supra, which was not the case here. "A requested charge must be legal, apt, and precisely adjusted to some principle involved in the case and be authorized by the evidence. If any portion of the request to charge fails in these requirements, denial of the request is proper. [Cit.]" *Stokes v. State*, 281 Ga. 875, 877 (3) (644 SE2d 116) (2007).

Nor did subsection (b) of the pattern instruction apply.

Critical to the application of the defense of habitation is the moment in time at which the defendant resorts to deadly force and the act being performed by the victim at that moment. The statute authorizes the use of deadly force in response to an unlawful entry into or an attack upon the habitation. [Cit.] Where a defendant does not use deadly force until the justification for the use of deadly force is over, there is no evidence to support a charge on defense of habitation. [Cit.] Where there is no evidence that the victim was attempting to enter or attack the habitation at the time

---

[3] According to the transcript, Kendrick's counsel read to the court the following language as his request for a jury instruction:

A person is justified in threatening or using force against another person when and to the extent that person reasonably believes that such threat of force is necessary to prevent or terminate the other's unlawful entry into or attack upon a motor vehicle. A person is justified in use of force that is intended to likely cause death or great bodily harm only if the entry is made or attempted in a violent manner, and the person reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person living or being in the motor vehicle, and that such force is necessary to prevent the assault or offer of personal violence or (b) the person reasonably believes that the entry is made or attempted for the purpose of committing a felony in the motor vehicle, and that such force is necessary to prevent the commission of the felony.

This is the only memorialization of the language of Kendrick's request, and it contains slight differences when compared to the pattern jury instruction. Although slight, these differences amply illustrate the importance of compliance with USCR 10.3.

he was injured by the defendant, the defense of habitation is not available. [Cits.]

*Coleman v. State*, 286 Ga. 291, 298 (6) (687 SE2d 427) (2009). Had Kendrick been justified in using deadly force to prevent Taylor's entry *into* his automobile for the purpose of committing the felony of motor vehicle theft, the theft was complete when Taylor drove away with the Cutlass, *Holt v. State*, 239 Ga. 606, 607 (238 SE2d 399) (1977), and the evidence showed that Kendrick did not use deadly force "until the justification for the use of deadly force [was] over. . . ." *Coleman*, supra. Under the facts of this case, there could be no reasonable belief that firing a pistol at the driver of another car while driving on the road was "necessary to prevent or terminate the other's unlawful entry into or attack upon a motor vehicle," as that term is used in the pattern jury instructions.

4. Kendrick claims that his trial counsel failed to provide effective representation in several respects. In order to prevail on this claim, he must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, the defendant must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, the defendant must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783.

Kendrick contends that counsel should have focused the jury's attention on the fact that Brooks was not being prosecuted for any involvement in the theft of the Cutlass, or for originally telling the investigating officers that he did not know that Taylor would steal the Cutlass when he exited the Hyundai. But, the jury had already been informed that Brooks had multiple felony convictions, was a close friend of the victim, and Kendrick fails to establish that had counsel additionally impeached Brooks, there is a reasonable probability that the result of the trial would have been different. See *Buchanan v. State*, 273 Ga. App. 174, 181-182 (5) (614 SE2d 786) (2005).

Next, Kendrick contends that trial counsel should have moved for a directed verdict on the malice and felony murder charges, and

should have attempted to have the case submitted to the jury solely on the charge of voluntary manslaughter. But, as noted in Division 1, supra, the evidence was sufficient to authorize a conviction of malice murder,[4] and a motion for directed verdict would have been fruitless. The trial court did not instruct the jury on the law regarding the offense of voluntary manslaughter, although such a charge was included in Kendrick's written submission regarding jury instructions. See Division 3, supra. During the charge conference, counsel stated that he had consulted with Kendrick, and he and Kendrick were in agreement to withdraw the request; the court asked Kendrick if that was correct, and he responded that it was. Trial counsel testified during the hearing on the motion for new trial, that when he and Kendrick discussed the jury instructions, Kendrick did not want to give the jury the option of a "compromise verdict" which would still result in significant prison time. The crux of Kendrick's defense was justification in defense of self, and under the circumstances, Kendrick fails to show deficient performance on trial counsel's part in withdrawing the request to instruct the jury as to voluntary manslaughter. See *Harris v. State*, 274 Ga. 774, 775 (3) (560 SE2d 642) (2002); *Van Alstine v. State*, 263 Ga. 1 (426 SE2d 360) (1993).

Finally, Kendrick contends that, after the trial court overruled his objection that the State's cross-examination of him constituted a comment on his right to remain silent, see Division 2, supra, trial counsel should have objected to further State questioning, which he now contends constituted such a comment.[5] Counsel testified that he

---

[4] The evidence was also sufficient to authorize the jury to find Kendrick guilty of felony murder. *Jackson*, supra.

[5] After the objection was overruled, the State's cross-examination regarding Kendrick's prior statements proceeded:

State: Isn't it true that the only, the first time that you have made this statement that you were defending yourself, after having been given several opportunities by Detective Wilbanks to tell him what happened, today is the first day you've given that explanation?

Kendrick: Given a statement to the State?

State: No.

Kendrick: Or given it to anyone?

State: Anyone associated with the State of Georgia?

Kendrick: That's what I'm saying, giving it to the State?

State: Yes.

Kendrick: Yes, it is my first time.

State: And you didn't give it to Detective Wilbanks on the morning that he came to tell you that he had found your car?

Kendrick: No, ma'am.

State: And you didn't give it to him when he came to execute the search warrant?

Kendrick: No, ma'am.

State: And you haven't ever given that statement to the lead investigator in this case?

Kendrick: No ma'am.

did not make any further objection because he did not want to highlight the issue of Kendrick's failure to tell the police anything regarding self-defense, and "by continuing to object I think [the jury] might have thought we were trying to hide something or that there was something there as to why [Kendrick] didn't say it." The State's questioning was similar to that which the trial court had already permitted, primarily eliciting specifics regarding the occasions when Kendrick spoke to investigating officers, and counsel's strategic decision not to highlight such cumulative information is a legitimate trial strategy that falls within the range of reasonable professional conduct. *Smith v. State*, 275 Ga. 326, 327-328 (3) (565 SE2d 453) (2002).

*Judgments affirmed. All the Justices concur.*

DECIDED JULY 5, 2010 —
RECONSIDERATION DENIED JULY 26, 2010.

*Thomas S. Clegg*, for appellant.

*Daniel J. Porter, District Attorney, Dawn H. Taylor, Wesley C. Ross, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Sheila E. Gallow, Assistant Attorney General*, for appellee.

---

State: And it's been three years?
Kendrick: Well, I learned, you know, to stay silent until you talk with your attorney.